UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 6:21-CR-61-REW-HAI-1 |
| ) | |
| v. ) | |
| ) | ORDER DENYING SUPPRESSION |
| RODNEY L. HIGGINS, ) | |
| ) | |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On August 27, 2021, the United States filed a criminal complaint against Defendant Rodney L. Higgins, alleging trafficking of meth and fentanyl. *See* DE 1 (Complaint). Subsequently, the grand jury indicted Higgins, along with three co-defendants (Jonathan Bushnell, Billy Griffin, and David Clem) for aggravated meth and fentanyl trafficking. *See* DE 12 (Indictment). The indictment referenced prior serious drug felonies against Higgins, and the Government also filed a § 851 Notice. *See* DE 75 (First § 851 Notice).

Higgins was set to go to trial on November 28, 2022, *see* DE 85, but instead he pleaded guilty to Count 2 of the Indictment, as well as a forfeiture allegation, at the pretrial conference-turned-rearraignment on November 22, 2022. *See* DE 110 (Minute Entry). On May 16, 2023, Higgins moved, *pro se*, to withdraw that guilty plea. *See* DE 137 (Motion). While the Court denied the motion (as Higgins had retained counsel), the Court ultimately held a hearing and replaced counsel. *See* DE 139; DE 143. With new counsel, Higgins again moved to withdraw the plea, and the Court eventually granted that motion. *See* DE 174. This set the stage for new defensive motions and the pending motion to suppress. *See* DE 177.

1

The Court referred the motion to Judge Ingram for consideration. *See* DE 178 (Order). The Government responded to Higgins's suppression motion, *see* DE 180, and moved to file the response, the attached exhibits, and other supporting evidence under seal. *See* DE 179 (First Sealing Motion); DE 181 (Second Sealing Motion); DE 182 (Sealed Document); DE 183 (Sealed Conventional Filing). Higgins subsequently replied. *See* DE 197 (Reply). In the interim, the grand jury returned a superseding indictment against Higgins, charging two new offenses: two counts of distribution of 50 grams or more of a meth mixture. *See* DE 184 (Superseding Indictment). The Government also filed a revised § 851 Notice. *See* DE 196 (Second § 851 Notice).

Higgins's suppression motion focused on evidence seized from his apartment pursuant to a search warrant issued by Judge Stinnett and executed on August 26, 2021. *See* DE 177 at 1. He argued "that the affidavit in support of the application for a search warrant for his residence lacked a proper nexus to his apartment, and therefore lacked probable cause for its issuance." *See id*. Higgins relatedly asked for a *Franks* hearing, arguing that the search warrant Affidavit "contained material misstatements and/or omissions entitling [him] to an evidentiary hearing[.]" *Id*.

Upon review, Judge Ingram issued a Recommended Disposition and Order, signaling that Higgins's motion be denied. *See* DE 199 (Recommended Disposition). The Magistrate Judge, in a thorough vetting, fully rejected the *Franks* predicates, upheld the existence of probable cause (nexus included), and alternatively endorsed the good faith exception. Finally, Judge Ingram recommended the unsealing of a number of the Government's provisionally sealed exhibits, namely DE 180-1, 180-2, 180-5, and 180-6. *See* DE 199 at 19.

Both the Government and Higgins object to Judge Ingram's Recommendation Disposition and Order. The Government objects to the unsealing of DE 180-1 and 180-2, arguing that both docket entries contain information related to "proactive cooperation in the investigation and

2

prosecution of this matter." *See* DE 201 (Government Objections). Higgins, though in basic agreement on the decision's catalogued legal standards, disputes all of Judge Ingram's key findings on probable case, the *Franks* rubric, and the good faith safe harbor. *See* DE 202 (Higgins's Objections). The Government had, but forwent, the option to further respond. *See* DE 206 (Government's Response).

The Court reviewed the full record, to include the motion and all briefs (including exhibits), the Recommended Disposition, and the objection briefing. The parties have fully and ably litigated the warrant. The Court **OVERRULES** Higgins's objections and, on de novo review, **ADOPTS** the Recommended Disposition, as it relates to search warrant validity and the *Franks* hearing request. Any analytical differences or additions relative to Judge Ingram's treatment appear in this Order. Accordingly, the Court **DENIES** the DE 177 Motion to Suppress.

On the sealing issues, the Court a) recognizes a legitimate reason for sealing part of the response and related documentation but b) sees the extent of the seal as far exceeding the justified scope under the taut sealing standards. There is "a 'strong presumption in favor of openness' as to court records.'" *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *In re Cendant Corp,* 260 F.3d 183, 194 (3d Cir. 2001)). "Only the most compelling reasons can justify non-disclosure of judicial records." *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983)). Even if a party can show a compelling reason why a document should be sealed, the seal must be narrowly tailored to serve that reason. *See Shane Group, Inc.*, 825 F.3d at 305 (citing *Press-Enter. Co. v. Superior Court of California, Riverside Cnty.*, 104 S.Ct. 819, 823-25 (1984)). "The proponent of sealing therefore must 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Id*. at 305-06 (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002)). The Court

3

temporarily maintains the sealed status, as to the DE 180 filings, but will include the topic and order suitable redactions as part of a hearing to be set. Blanket sealing is easy on the filing lawyer but quite hard on the public's access rights and the First Amendment. Particularly on a key substantive motion, full sealing will rarely square with the governing standards.

I.  **Review Standards**

The district court reviews a magistrate judge's recommended disposition, in the suppression context, under 28 U.S.C. § 636(b)(1)(B) and Rule 59(b). When a party objects with adequate detail, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3) (requiring that district judge "must consider de novo any objection"). The district court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Rule 59(b)(3) (enumerating options). Higgins objects, with proper specificity, to Judge Ingram's full answers on the key suppression findings, so the Court decides the motion de novo. That said, Higgins does not criticize the recited legal standards, which the Court agrees with and largely relies on.

II.  **Analysis**

   a.  **Probable Cause for the Search Warrant**

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When determining whether an affidavit establishes probable cause,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will

4

>be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 103 S. Ct. 2317, 2332 (1983) (quoting *Jones v. United States*, 80 S. Ct. 725, 736 (1960)). Probable cause exists "when an affidavit shows a 'fair probability' that criminal evidence will be found in the place to be searched." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (quoting *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018)); *see also United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (quoting *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018)) ("Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'"). "With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *Id*. (citing *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)).

Importantly, the analysis, relative to warrant validity, is not a de novo line-by-line exegesis and critique; rather, the reviewing court looks at the full picture, in context, and determines whether the issuing judge had a substantial, non-arbitrary foundation for the probable cause determination. *See Christian*, 925 F.3d at 310. A warrant application need not be perfect; it need only be sufficient to cross the modest hurdle of probable cause. The Sixth Circuit has stressed "the undemanding character of the probable-cause standard and the deferential nature of" review. *See id.* at 311.

As in other cases, with drug offenses, "law enforcement officials must present evidence from which the magistrate judge can conclude from the totality of the circumstances, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (quoting *United States v. Williams*, 224 F.3d

530, 532 (6th Cir. 2000)) (internal quotation marks omitted). If the place to be searched is a residence, the mere fact that a resident is a known drug dealer is not, on its own, enough to create a nexus "between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016). Instead, there must be "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence . . . such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id*. at 383 (collecting cases).

Higgins seizes on and stresses the *Brown* concept, but the issue is a highly nuanced topic. "Mere" dealer status is not enough, but courts readily recognize a counterbalancing link, that "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. James*, 2023 WL 4536086, at *3 (6th Cir. 2023) (quoting *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020). *James* rightly labels this intersection "a common pressure point of [Circuit] nexus requirement jurisprudence." *James*, 2023 WL 4536086, at *3. The tension gets resolved "in fact-specific ways" across the cases. *See id.* The watershed variously turns on "recency, frequency, and quantity of the drug dealing and its proximity to the residence as a few of the dividing lines." *See id.* Low-volume or temporally remote activity may fall on the *Brown* side, while large quantities routinely distributed within "ongoing" operations may fall on the *Sumlin* side. *See id.; see also United States v. Sheckles*, 996 F.3d 330, 341-42 (6th Cir.)(discussing reconciliation of tension as hinging on "continual and ongoing operations" that typically "involv[e] large amounts of drugs" versus single instance activities or those lacking reliable information regarding dealer status) *cert. denied*, 142 S. Ct. 717 (2021). Of course, if there is activity tied directly to the search-target location, that is a crucial additive feature, thus potentially cinching probable cause when "mere" dealer status would not, itself, have sufficed. *See United States v. Grant*, Case No. 21-3686, 2023 WL 119399, at *3 (6th Cir. Jan. 6, 2023) ("In other cases, we have

6

inferred a nexus between a known drug trafficker and a residence when there is strong evidence linking the suspect to the residence, and there is some additional evidence of drug activity at the residence."); *see also United States v. Helton*, 35 F.4th 511, 520 (6th Cir. 2020) (noting additional requirement, to status as a drug dealer "standing alone," of "facts showing that the residence has been used in drug trafficking").

*The four corners evince probable cause.*

First, the Affidavit, as presented to Judge Stinnett, plainly presents probable cause. It includes the following elements:

1. The Affidavit sets forth expertise from a well-credentialed agent, *e.g.*, setting expectations on likely contraband, the presence of drugs and electronics, *etc.*, in the residence of a person engaged in trafficking, and the common use of coded language in communications. *See* DE 177-8 ¶¶ 1-4.

2. The application depicts an investigation rooted in seized meth from a high quantity, long-term methamphetamine trafficking operation. Thus, the case genesis was a large seizure, on June 15, 2021 from CS1, who was enroute to a meth delivery. CS1 referenced a man, identified as Higgins, as one of his sources, described a transaction history involving over ten 1+ lb. meth deals, and referenced having seen a large quantity of meth at Higgins's residence "on one occasion." *See* DE 177-8 ¶ 5(A).

3. The CS then backed up his story with two controlled buys, each under law enforcement direction and control.[1] One was on June 16 (just a day after the first seizure) and one on

---

[1] The Court rejects Higgins's assault on CS reliability. CS1 did provide some hearsay information that contributed to the warrant—mainly the trafficking history and coding between him and Higgins. However, CS1 proved himself by arranging two pound-quantity meth deals that matched the historical cycle. He also interacted with Higgins on August 25-26 in a way that, in any fair reading, plausibly signaled another deal in the offing, this one connected directly to the current residence. Confirmatory buys and other events witnessed, indeed managed, by law enforcement, surely

7

July 1, 2021. Each matched the CS's prior depiction, a 1 lb. buy from Higgins. Further, each (a pound for $4,500 in buy money) occurred at Tates Creek Centre in Lexington. Law enforcement monitored the buys, confirmed objective indicia of Higgins's presence, and confirmed the purchased drugs. *See id.* ¶¶ 5(C) & 5(D).

4. The Affidavit includes an incriminating history as to Higgins. It references two Kentucky TICS 1st convictions, in or around 2004-05, with each yielding lengthy (7- and 12-year) prison sentences. *See id.* ¶ 5(B).

5. The Affidavit confirmed Higgins's address, by August 2021, at the Enclave Hartland Apartments (#924). *See id.* ¶ 5(E).

6. Finally, (in 5(G), (H), and (I)), the Affidavit relays the events of August 25 and August 26, 2021.[2] Per the Affiant, Higgins contacted the CS and stated: "I got more clear and I got more of that slow." The Affiant saw the messages and averred that the CS interpreted the code words clear and slow to mean, respectively, meth and heroin/fentanyl. The next day, law enforcement had the Affiant attempt to arrange another transaction—critically, Higgins told the CS to come to his "crib" to conclude the deal, later confirmed by Higgins as the target apartment complex in a recorded call. Police verified that Higgins was present at the unit in question on the very day, that he had both left from and returned to the location. The warrant issued on the basis of the application.

---

bolstered the reliability and knowledge basis for CS1. *See United States v. Coleman*, 923 F.3d 450, 458 (6th Cir. 2019) (finding probable cause and distinguishing source from "unproven tipster," in part because "the informant was reliable, having conducted multiple controlled buys associated with the case[.]"). Of course, most of the key Affidavit content was objective and occurred before law enforcement, so CS1's credibility was not a lynchpin in this case.

[2] Higgins complains about the time gap between the July buy and the August warrant. Certainly, the passage of time would be a factor for consideration regarding potential staleness. However, the relationship depicted involved over a dozen high-scale meth transactions, with verifying deals in June and July. Most critically, of course, the warrant issued based on facts as recent as the day of the search—Higgins reupping with "clear," letting CS1 know what he had, and arranging for CS1 to come to Higgins's home when both were "ready." There is no staleness problem in a warrant featuring such currency.

The four corners of the Affidavit provide probable cause, and the decision is not a close one. The reliable information (including, critically, the initial seizure, the recited transactional history, two fully corroborating controlled buys, and a third discussed buy on the date of the warrant application) strongly indicates active, high-volume trafficking by Higgins with a direct tie to the residence at issue. If Higgins, given his 13-deal history with CS1, alerted the CS that he had "more clear" (read, "meth") and the next day directed the CS to Higgins's "crib" to complete another trade, there surely was a fair and immediate probability of finding drug-related evidence at Higgins's apartment. "I got more clear" means Higgins likely had possession of meth. Where? Well, Higgins told the inquiring CS1 to come to his "crib," later specified in a call as the target location.[3] Judge Stinnett, vetting the totality with common sense, quite rightly issued the warrant based on the four corners presented. He undoubtedly had a substantial and non-arbitrary foundation for probable cause and thus for warrant issuance.

To avoid this conclusion, Higgins tries to knock out paragraphs 5(A) and 5(H) through a *Franks* theory. Here are 5(A) and 5(H) (plus (G), to be complete) in their entireties:

> (A.) On June 15, 2021, the DEA conducted an operation that resulted in the detention of a cooperating source, hereinafter CS1. At the time of his detention CS 1 was in possession of approximately 1 lb. of methamphetamine (meth) and enroute to meet a third party to deliver the meth. CS1 stated he/she received the meth that he/she was caught with from a male subject later positively identified as Rodney H. HIGGINS, and that the meth was part of an approximately 1.5 lb. transaction. CS1 stated he received 1 lb. or more from HIGGINS on at least 10 prior occasions. CS1 stated he was in HIGGINS's residence on one occasion when CS1 saw a duffle bag full of meth.
> * * * * *

---

[3] Consider also *Sheckles*, which found a suitable "specific connection" between the dealer's target residence and the phone used "to coordinate the drug deal[.]" *Sheckles*, 996 F.3d at 342. The application had sought phones that likely contained information about suppliers and buyers, and the court found probable cause because there was a fair probability that the phone (evidence) would be at the residence where it had pinged. Higgins is in the same boat. Authorities confirmed he was at home on the same date he had been texting and calling CS1 to set up the meet at Higgins's own home. The phone Higgins used, itself, was a piece of evidence likely to be found at the residence, as in *Sheckles*.

9

> (G.) On August 25, 2021, HIGGINS contacted CS1 through text messaging and stated: "I got more clear and I got more of that slow". According to CS1, "clear" is a code word used by HIGGINS in reference to meth. Similarly, "slow" is a code word used to reference heroin, fentanyl, or a combination of the two. CS1 showed these messages to law enforcement.
>
> (H.) On August 26, 2021, at the direction and discretion of law enforcement, CS1 attempted to arrange another controlled transaction from HIGGINS. HIGGINS texted CS1 back and told him/her to come to HIGGINS's "crib." Law enforcement then had CS1 place make a recorded phone call to HIGGINS. In this call, HIGGINS directed CS1 to come to the Enclave Hartland Apartments to complete the transaction.

As to 5(A), Higgins claims that one line is contextually false: "CS1 stated he was in HIGGINS's residence on one occasion when CS1 saw a duffle bag full of meth." Everyone agrees that the residence here referenced by CS1 is not the residence targeted by the warrant—Higgins moved at some point in the interval between the June events and the August events. As to 5(H), Higgins assaults the accuracy of the summary, contending that the Affiant falsely described or characterized the "transaction" allegedly discussed and to be completed between Higgins and CS1. Higgins seeks a *Franks* hearing and, ultimately, removal of those application components with resulting suppression.

### b. Higgins's *Franks* Hearing Request

Higgins argues that he is entitled to a *Franks* hearing because of a material omission in paragraph 5(A) and misstatement of material facts in paragraph 5(H) of the Affidavit. *See* DE 177-1 at 13-16. *See also Franks v. Delaware*, 98 S. Ct. 2674 (1978).

The Sixth Circuit provides this formulation of the *Franks* standards, as to included and omitted information:

> In *Franks*, the Court held that a party may only challenge the veracity of an affidavit if that party can make a "substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that the allegedly false statement was necessary for a finding of probable cause. The inquiry does not continue if the court finds that the exclusion of the allegedly false statement does not result in a lack of

10

> probable cause. If the party succeeds in meeting this burden, the party is entitled to a hearing to determine if a preponderance of the evidence supports the allegation of lack of veracity. While this case does not involve any allegedly false statements, we have previously held that the *Franks* doctrine applies to omissions of information from affidavits as well.
>
> A *Franks* hearing may be merited when facts have been omitted in a warrant application, but only in rare instances. This Court recently held in *U.S. v. Atkins*, that affidavits with potentially material omissions, while not immune from *Franks* inquiry, are much less likely to merit a *Franks* hearing than are affidavits including allegedly false statements. This court reasoned that allowing omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned.

*Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (internal citations omitted). In the case of an omission, the Circuit has described the "higher standard" as requiring that a "defendant must prove "that an officer omitted the information 'with an intention to mislead (not just with recklessness) and that the omission of the information was 'critical to the finding of probable cause[.]'" *United States v. Davis*, 84 F.4th 672, 682 (6th Cir. 2023) (quoting *Mays*). The movant must provide proper evidence of falsity and intent. *United States v. Tate*, 2022 WL 1224552, at *3-4 (6th Cir. 2022) (requiring proof to support *Franks* allegations, noting that relief for omissions occurs only in "rare instances," and rejecting "conclusory" arguments about falsity). If probable cause persists after accounting for alleged false inclusions (or improper omissions), no further hearing is warranted. *United States v. Poulsen,* 655 F.3d 492, 504-05 (6th Cir. 2011).

> A *Franks* analysis turns on two questions of fact, and one of law. The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

11

*United States v. Crawford*, 843 F.3d 297, 309 (6th Cir. 2019). Courts, logically, are not limited to the four corners of a search warrant affidavit when assessing a defendant's *Franks* challenge. *See United States v. Arnold*, 500 F.Supp.3d 656, 657-58 (N.D. Ohio 2020).

Beginning with paragraph 5(A), Higgins complains that the reference to CS1 once seeing a "duffle bag full of meth" in "HIGGINS's residence" was improperly misleading. First, it is true that the application's use of "residence" repeatedly cites to #924, the Hartland Enclave address on Rapid Run Drive. This happens twice within one paragraph of the term "residence" in ¶ 5(A). Using "residence" for the CS1 statement does inaccurately signal that where CS1 saw that duffle of meth was the *same* apartment, because the Affidavit does not account for Higgins's interim relocation to a different apartment. Thus, by omitting the full picture, there is a suggested link to the current address that is not accurate.

Has Higgins shown culpability here? The Court agrees that the Affiant knew Higgins had moved, but did the Affiant omit the full story with intent to mislead the issuing judge? Surely not, on this record. Although the warrant analysis sticks to the four corners, the intent question under *Franks* by definition is a broader matter, so the Court has taken account of the many exhibits and investigative records tendered by the parties. Plainly, CS1's statement about the duffle of meth surfaced in his June 15 initial interaction with law enforcement. *See* DE 180-3.

The statement did not tie what CS1 observed as Higgins's residence to any particular time or date, it merely was "on one occasion" in the history between Higgins and CS1. The Affiant could have been clearer and inserted a sentence about the later move, but the fact that CS1 saw "on one occasion" a load of meth where Higgins lived simply indicates that Higgins had kept meth in his home at some earlier point. The dateless incident did not significantly advance the inquiry into probable cause for searching Higgins's verified residence at the time of the warrant

application, some ten weeks later. The Court finds that the Affiant's imprecision—failing to clarify that the residence referenced in June 2021 was no longer Higgins's residence by August 2021—at most was a matter of negligence. Logically, the Affiant hardly needed to create a false impression about where a duffel of meth once appeared when Higgins had directed CS1 to come to Higgins's own "crib" relative to a brewing meth deal on the very date of the warrant application. Further, while including the move might have weakened any historical link to the specific location, but it would not have weakened the basis for believing that Higgins, at least once historically, had used his abode to store drugs. These minor variations on logical strength are mere window dressing for an application centered on the verified trafficking and late-August instantiation in this Affidavit. This all sharply cuts against believing that TFO Dalrymple was trying to mislead Judge Stinnett. At most, he recorded the version that was temporally correct when and as relayed by the CS in June, and failed to see the inaccuracy in impression by not reciting the interim move. The Court does not see this as even nearing the high *Franks* bar for an omission.

As Judge Ingram did, though, the Court also answers the predicate *Franks* legal question counter to Higgins—simply put, the 5(A)-duffel sentence can be removed with no impact on probable cause. For all the reasons listed previously, and even eliding the 5(A)-concluding sentence, probable cause easily exists. Proof of a long-term, ongoing, high-volume meth trafficking relationship (corroborated through pound-level buys), the dealer's expressed possession of current meth, and an incipient deal to conclude at the dealer's own apartment yields probable cause to search that location. Removing the stray and undated historical observation by CS1 in no way alters that conclusion. An omission matters only if the withheld information impacts facts "critical to the finding of probable cause," and such is not the case here.

Turning to paragraph 5(H), Higgins argues that the paragraph contains factual misstatements. Essentially, he contends that DEA TFO Dalrymple's account of the interactions between CS1 and Higgins are misleading, and that his interpretation of the text messages misstates what actually occurred. *See* DE 177-1 at 14. The question here is whether DEA TFO Dalrymple's descriptions are demonstrably false. Search warrants are entitled to a presumption of regularity. *See Illinois v. Gates*, 103 S. Ct. 2317, 2331 (1983); *United States v. Leon*, 104 S. Ct. 3405, 3415-16 (1984).

In the Court's view, the Affiant's summary fully comports with the record. Against a backdrop of about 12 pound+ meth deals between CS1 and Higgins, Higgins contacted CS1 on August 25 to inform him, "I got more clear and I got more of that slow." The Affiant saw these messages. CS1 decoded "clear" to mean meth and "slow" an opiate, heroin and/or fentanyl.

Higgins complains that the messages are not in the discovery, but there is utterly nothing to suggest TFO Dalrymple is lying when he avers he read the text chain. Further, the encoding proof has substantial corroboration in the texts from June 15, when CS1 had begun cooperating with law enforcement. DE 180-4 sets forth those exchanges. There, CS1 asks if Higgins "had 1 I could get." *Id.* at Page ID# 802. Higgins responds: "Oh of the **clear**? Like the whole thing?" *Id.* at #803 (emphasis added). He quotes a price at 45, *id.*, which is the exact amount CS1 paid Higgins for a pound of meth the next day. These elements of the discovery are confirmatory as to the Affidavit.

The sockdolager is ¶ 5(H), which has the greatest nexus value and is the one Higgins strains hardest to exclude. What actually undergirds the Affiant's summary? CS1, having been told by Higgins the day prior that he "got more clear" opens a dialog with Higgins on August 26. That started with him texting "I need to Holla at ya." DE 180-7, Page Id# 813. Higgins confirms, "I

14

be ready at 12." *Id.* Later, CS1 confirms his own readiness, "I'm ready if you are." Higgins says, "Yes come on im at crib." Id. at #814. CS1 and Higgins had a recorded call where Higgins confirmed his location, where CS1 should come, as the Enclave Hartland apartments.

Higgins complains that these interactions do not show a fully and finally negotiated drug deal to occur on August 26 from Higgins's home. True enough, the parties did not name a price, substance, or quantity. However, this is not a contract case, it is a circumstance for judging fair probabilities about the location of contraband. The preliminaries between CS1 and Higgins strongly indicate in incipient drug deal. After all, CS1 was working for law enforcement, and TFO Dalrymple described CS1 as acting "at the direction . . . of law enforcement, CS1 attempted to arrange another controlled substance transaction from HIGGINS." ¶ 5(H). That is the context for the contact. CS1 began the contact on August 26 precisely as he had back on June 16—"Whats up I need to come holla at ya." DE 180-4, Page Id. # 802. What followed in June was the 1 lb. meth purchase. On August 26, CS1 made the like overture mere hours after Higgins contacted him to apprise CS1 Higgins had more "clear" and more "slow." Both men forecasted when they would be "ready" on the 26th, and Higgins, on CS1's go *immediately* directed CS1 to come to his "crib," later confirmed in a recorded call as the Enclave Hartland address. DE 180-7, at Page ID# 814; Affidavit ¶ 5(H). The full history encompassed twelve prior transactions involving 1+ pounds of meth each time. The immediate past deals (from June 16 and July 1) identically were 1 lb./$4500 transactions. Agent Dalrymple's summary is fully consistent with the objective record, presented through the lens of an officer highly experienced in the drug realm. It is, of course, *possible* that CS1 and Higgins were meeting at Higgins's "crib" for some innocuous purpose; however, it would abuse common sense and ignore the well-established dynamics between the men to view the lead up to August 26 as anything other than likely setting the stage for yet another drug deal. Finding

15

utterly no falsity or qualifying culpability as to the content in para. 5(H), the *Franks* foray ends at the threshold.

### c. Good Faith

Judge Ingram found that, even if the warrant application failed to establish probable cause, the good faith exception would prevent exclusion. *See* DE 199 at 17-19. As already stated, there was sufficient probable cause for the search warrant, with a solid nexus to Higgins's apartment. There is also no basis for a *Franks* hearing. As such, there is no need for a good faith alternative. However, on this record, and to be complete, the Court would find good faith.

As the Sixth Circuit explained,

> When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure. If the evidence was obtained in objectively reasonable reliance on the subsequently invalidated search warrant, however, it should not be suppressed. For this exception to apply, the affidavit must contain a minimally sufficient nexus between the illegal activity and the place to be searched. A police officer does not manifest objective food faith in relying on a warrant if the affidavit is so lacking indicia of probable cause as to render official belief in its existence entirely unreasonable.

*Brown*, 828 F.3d at 385; *see also United States v. Leon*, 104 S. Ct. 3405 (1984). The good faith standard is "less demanding than the standard for probable cause [and] the affidavit . . . must draw some plausible connection to the [suspect's] residence." Brown, 828 F.3d at 385-86; *see also United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (finding *Leon* applicable when "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause.").

Suppression should apply only in circumstances of misconduct, given the exclusionary rule's foundations. *See United States v. Meadows*, 2021 WL 4782259, at *8 (E.D. Ky.

2021)(discussing deterrence rubric in context of exclusionary rule). Higgins tries to resist good faith by citing the *Leon* carve out for *Franks* consideration, but the Court has already rejected the premise that the Affidavit contained deliberate or reckless falsity or culpable omissions of consequence. And this warrant, processed and duly issued by an impartial federal judge, plainly reflects not just a minimal or plausible nexus, but a sturdy one. No misconduct appears in this record. As such, were probable cause in doubt, *Leon* would save from suppression the fruits of the August 26 search.

### d. Sealing of the Government's Exhibits

Finally, the Government objects to Judge's Ingram recommendation to unseal DE 180-1 and DE 180-2. *See* DE 201. The Government argues that the documents "contain information related to proactive cooperation in the investigation and prosecution of this matter." *Id*. at 2. As stated earlier, the seal justification is sufficient, but the Court views the extent of sealing as excessive. *See United States v. Doe*, 962 F.3d 139 (4th Cir. 2020) (recognizing the protection of cooperating witnesses as a "compelling interest" under the First Amendment). The Court keeps the DE 180 suite of filings sealed, but the Court will set a hearing to establish a trial date and to deal with the scope of the seal.

### III. Conclusion

Through fulsome litigation, the warrant at issue has now been well tested. The Court, on de novo review but in full agreement with Judge Ingram's views, sees unassailable probable cause (nexus included) and no basis to conduct a *Franks* hearing. Further, three judges now have agreed on the probable cause foundation, which surely means that, even if all three are wrong, the blameless officers searching under the warrant's authority did so within the safe harbor of *Leon*. The Court DENIES DE 177.

Lastly, the Court temporarily maintains the seal on the DE 180 suite of filings and will revisit the seal at a hearing to be set, where the Court will also schedule the trial.

This the 2nd day of January, 2024.

Signed By:
*Robert E. Wier*  /s/ REW
**United States District Judge**